Dunkin', Ch.
delivered the opinion of the Court.
The decree of this Court, pronounced in May, 1841, established the contract alleged by the complainants to have been made by the testator of the defendants in 1822. The decree affirmed that, at the Sheriff’s sales of Pickett’s property, William Lewis purchased, on the agreement that it was for the benefit of the family of Pickett, whose wife was the testator’s daughter, and that, after the payment of the partnership debts of Pickett and Lewis, and the private debts of J. R. Pickett, the property should be returned to the family, Frpm the time of the sale in 1822, until the marriage of Mrs. Pickett in 1825, the property rerqained ip her- possession; William Lewis receiving the proceeds of the crops, and applying them to the payment of debts. On the marriage of Mrs. Pickett to Dr. McCullough, in 1825, Win..Lewis took exclusive pos- • session of the property. Mrs. McCullough died in 1826, the year after her marriage, and her five children, who were very young, lived for some years Avith their grandfather, the testator, ' " -
*163 The Commissioner adopts the conclusion that the decree of the Appeal Court had declared the testator, Wm. Lewis, to fee a trespasser, and he infers that it was intended he should account as such. This is certainly a misapprehension. The Court held that he was in possession under a contract to hold for the benefit of Pickett’s family, and the object was to make him comply with this contract, and account as he would have accounted if he had fulfilled his engagement. The principal property, purchased by William Lewis, and for which he was thus held accountable, consisted of three tracts of land and a gang of negroes, in which there were about sixteen workers, and among them a blacksmith, two carpenters, and two boat hands. The Commissioner’s account is made up by ascertaining for how much each negro ■could probably have been hired, and at what rate per acre the land could have been rented. The Chancellor, we think very properly, sustained the exception to this inode of raising the account. In the three or four first years Mrs. Pickett ana her family resided on the plantation, and Wm. Lewis is charged in the account with the proceeds of the cotton crop of those years. When Mrs. Pickett married Dr. McCullough, Mr. Lewis deemed it proper to take exclusive charge of the ■estate. Assuming that he was prudent and diligent, he is responsible for what was made in each subsequent year.— There may be difficulty in ascertaining this, and no specific rule can be laid down which is applicable to all cases and under all circumstances. Mr. Lewis was not an executor, whose duty required him to make annual returns to the Ordinary, nor was he such trustee as is required to account annually to the Court of Equity, but he should have kept such accounts as would enable him to show satisfactorily the manner in which he has discharged his trust. Having failed ■to do so, the Court is obliged to resort to such testimony as the circumstances afford. In respect to the cotton crop the t iourt sees no reason to object to the mode adopted by the Commissioner, for the years 1822, ’23, ’24, and ’25, and the same principle may be applied to the subsequent years, varying the amount according to the testimony. But it may be, and it was so urged by the complainants, that there were other sources of profit which should be taken into consideration in estimating the annual value. It was said there were carpenters and a blacksmith which were hired out, or were employed about the business of Mr. Lewis, and boat hands who were employed in the same way — all this, and any other source of profit, should be estimated by the Commissioner, and should be charged in the account.
The Court has declined to sanction the measure or mode of accountability adopted by the Commissioner, because the defendants’s testator did not hold the negroes under a contract *164 of hiring, nor did he hire out the gang of negroes or the lands to third persons ; nor was it his duty to do so — on the contrary, it was understood that they were to be kept together, and Mr. Lewis acted on this understanding. There are advantages in the improvement of the condition of the property, which more than compensate for the diminished money income, and trustees should be encouraged to keep the estate together when it is thus situated. But there are advantages beyond the mere improvement of the property. While Mrs. Pickett and her children resided on the place, they derived their support from it, without any diminution of the income. And this brings the Court to the consideration of the complainant’s exception, in relation to the board of J. R. Pickett’s children. He died in 1822, leaving five children, to wit: four daughters, the eldest of whom was ten years of age. and one son, an infant. On the death of their mother, four years afterwards, 1826, their grandfather, instead of leaving them with their stepfather, or on the plantation with an overseer, kindly and naturally took them home. “ Mr. Lewis,” says one of the witnesses, (George S. Peay,) “was as wealthy as any man in his section of the country, except Col. Peay or Reuben Harrison.” The eldest daughter was married in 1832, the second in 1833, and the three other children left him in 1836. They never went to any other than a neighborhood school. The question arising out of the exception, is whether Mr. Lewis is entitled to any, and if any, what, charge for the board of his grandchildren while with him. From what has been said it is quite manifest that, for the ordinary means of livelihood, the children were entitled to depend on the productions of the property which belonged to them, and which do not affect the income. In this way they had been hitherto supported, and, so far as can be ascertained, without charge. Evidence was offered as to the price at which each of these children could have been boarded out. But this assumes that the person who takes them to board furnishes everything, provisions, &c., and moreover that he makes a profit from it. And this leads to the inquiry whether Mr. Lewis, when he took the children home on the death of his daughter, intended to charge them board, or acted from the impulses of his heart, and voluntarily assumed the place of a parent to the orphan children. If it was intended as a gratuity it is hardly necessary to say that it cannot after-wards be converted into a charge. It is not enough to say that he found his benevolence misplaced, and that the objects of his bounty proved ungrateful. If, from the circumstances of the case, it is manifest that he received and entertained them, intending to make no charge, he must be satified with the reward of an approving conscience.
There is no evidence whatever that Mr. Lewis ever con *165 templated such charge until long after his grandchildren had left him, or until the rupture between them and himself.— The estate of Pickett was much involved, and in no view that can be taken of the accounts, was it disembarrassed until after his children had left their grandfather in 1836. According to the mode of accounting adopted by the Court, Mr. Lewis is placed in the favorable condition of the owner of an estate, setting forth the profits of if. All the ordinary sources of maintaining a family, in the condition in which the children of Pickett were maintained, are derived, or might be derived, from the plantation, and for the other comparatively inconsiderable expenditures, if any such were incurred, the Court is of opinion, on the evidence and the circumstances, that no charge was intended to be made, and should not, therefore, be now allowed. On all the other points considered in the decree of the Circuit Court, and ruled by that decree, this Court concurs in the judgment of the Chancellor.
12 Eng. C. G. 32‘
The Court avails itself of this occasion to make an observation in regard to the practice in the Commissioner’s office. There are twenty-nine exceptions to the Commissioner’s report, seventeen on the part of the complainants, and twelve on the part of the defendants. The evidence comprises about two hundred pages of closely written foolscap paper. Now the duty of the Commissioner, in such cases, is well stated in Johnston v. Reardon. “It is not necessary in the report to detail all the evidence. It is sufficient to specify so much as will enable the Court to see with certainty the evidence upon which the Master acts. The Master is, through the medium of evidence, to certify facts upon which the Court is to adjudicate. If either party, by exceptions, question the sufficiency of the evidence to warrant the facts so certified, the Court should have before it the means of looking into such evidence, in order to judge of the legality or sufficiency of it to sustain the finding.” In the Commissioner’s report, on the exceptions, he should point to the particular evidence which has been heard by him, and on which his judgment is based in sustaining or overruling such exceptions, it is in cases of the character now under consideration, that a report on the exceptions is particularly necessary, as the Commissioner, who is familiar with the testimony, however complicated and voluminous, may easily classify and arrange it for the inspection and examination of the Court.
It is ordered and decreed that the decree of the Circuit Court be reformed, and that the account be restated by the Commissioner according to the principles herein before declared and prescribed.
Johnston, Ch. Caldwell, Ch. Dargan, Ch. concurred.

Decree modified.